# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2023-1866
_____

EGLIN FEDERAL CREDIT UNION,

    Appellant,

    v.

KELSEY M. BAIRD and PAULA
STOKES-WILKINSON,
individually and on behalf of all
others similarly situated,

    Appellees.

_____


On appeal from the Circuit Court for Okaloosa County.
Terry D. Terrell, Judge.


August 28, 2024


LONG, J.

This is an interlocutory appeal concerning the denial of two motions to compel arbitration filed by Appellant, Eglin Federal Credit Union ("Eglin"). We have jurisdiction. § 682.20, Fla. Stat.

I.

Eglin is a not-for-profit cooperative and financial institution that provides account and loan services to its members. Appellees, Kelsey Baird ("Baird") and Paula Stokes-Wilkinson ("Stokes") (collectively, "Appellees") were members of Eglin at the time the

underlying action commenced. The relationship between Eglin and Appellees is defined by various account documents that form the governing contract between them, hereinafter referred to as the "Agreement." When Appellees began their relationship with Eglin, the Agreement did not contain an arbitration provision or a class action waiver provision. At Eglin's October 2021 board meeting, the board took a formal vote to add these provisions to the parties' Agreement.

Eglin notified its members of this change by mail. It purportedly mailed all members a cover letter, the Arbitration Provision ("Provision") and Class Action Waiver ("Waiver"), and the opt-out form in late December 2021. The cover letter provided that a member's continued use of their Eglin account would act as consent to the Provision and Waiver. Its effective date was January 1, 2022. Members could reject the Provision by submitting the opt-out form, with a signature that was notarized or witnessed by an Eglin employee. But members could not opt-out of the Waiver.

Eglin also sends routine emails informing its members when their electronic statements are available to view. These emails sometimes contain a hyperlink to Eglin's quarterly newsletter. After the changes to the Agreement went into effect, the four-page newsletter included (along with Happy New Year messages, wealth management advertisements, cybersecurity tips, upcoming meeting notices, personnel updates, and other items) a statement that members had been mailed a notice regarding a "new Arbitration Provision and Class Action Waiver that amends the Membership and Account Terms and Conditions section in the [Understanding Your Share Account] booklet." It said that members could get a physical copy of the new terms in a branch store or by contacting Eglin. The newsletter did not contain, or hyperlink to, the text of the Provision and Waiver or the opt-out form.

The physical notice was mailed to Stokes' address on file with Eglin on December 30, 2021. Stokes continued to use her Eglin account as normal. Eglin never mailed the notice to Baird, but both parties received emails regarding their electronic statements, which contained hyperlinks to the newsletter. Shortly after, both

parties filed separate lawsuits against Eglin, alleging that it was improperly assessing fees against its customers. The cases were consolidated, and Appellees subsequently filed their consolidated class action complaint. Eglin moved to compel arbitration on both claims, pursuant to the newly added Provision.

The trial court held a hearing on the motions and found that Eglin had not entered into an enforceable agreement to arbitrate with Stokes or Baird. Specifically, it found that Eglin's unilateral imposition of the new terms was improper, that it failed to provide reasonable notice of the new terms, and that neither Stokes nor Baird assented to the new terms. Further, the trial court found that even if the Provision was otherwise valid, it is inapplicable to their claims. The trial court interpreted the language of the Provision as "forward-looking" and concluded it did not retroactively apply to Stokes' and Baird's previously accrued claims. Eglin appealed.

II.

We apply a mixed standard of review when reviewing an order denying arbitration. *See MetroPCS Comms., Inc. v. Porter*, 273 So. 3d 1025, 1027 (Fla. 3d DCA 2018). We review whether the trial court's findings of fact are supported by competent, substantial evidence, and we review its conclusions of law de novo. *Id.*

We first address whether Eglin and Baird entered into an agreement to arbitrate. Eglin argues on appeal that it provided Baird with reasonable notice of the Provision and Waiver. We disagree.

"Appellants, as the proponents of arbitration, have the burden of establishing an enforceable written agreement to arbitrate." *Palm Garden of Healthcare Holdings, LLC v. Haydu*, 209 So. 3d 636, 638 (Fla. 5th DCA 2017). Under Florida law, a valid contract requires "offer, acceptance, consideration and sufficient specification of essential terms." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004). "Mutual assent is an absolute condition precedent to the formation of the contract," without which "neither the contract nor any of its provisions come into

3

existence." *Gibson v. Courtois*, 539 So. 2d 459, 460 (Fla. 1989). And an "offeree cannot actually assent to an offer unless the offeree knows of its existence." 1 WILLISTON ON CONTRACTS § 4:16 (4th ed.).

Mutual assent can be shown where a contract is knowingly and intentionally signed by both parties—the signatures serving as a demonstration and confirmation of the parties' assent. *See Arena Football League v. Bishop*, 220 So. 3d 1243, 1245 (Fla. 1st DCA 2017). But demonstrating assent is not always that simple. It can sometimes be shown through other means, such as acts or conduct of the parties. *Id.* at 1246.

The analysis typically begins with asking whether the offeree had notice of the offer. Notice can be express, which is "direct information," or implied, which is "notice inferred from the fact that the person had means of knowledge." *Domino v. Nielsen*, 322 So. 3d 691, 692 (Fla. 4th DCA 2021) (quoting *Sapp v. Warner*, 141 So. 124, 127 (Fla. 1932)).

To help evaluate claims of notice in the internet age, courts have attempted to catalog and classify different kinds of web-based contracts. *See MetroPCS*, 273 So. 3d at 1028; *Badcock v. Neutron Holdings, Inc.*, 454 F. Supp. 3d 1222, 1230 (S.D. Fla. 2020).[1] For

---

[1] These classifications include "browsewrap," which is "an agreement where the user accepts a website's terms of use merely by browsing the site," "clickwrap," which is "an agreement where the user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available," "scrollwrap," which is "like the 'clickwrap' agreement, but the user is presented with the entire agreement and must physically scroll to the bottom of the agreement to find the 'I agree' or 'I accept' button," *Babcock*, 454 F. Supp. 3d at 1230 n.4, and "sign-in wrap," which is "where a user signs up to use an internet product or service, and the sign-up states that 'acceptance of a separate agreement is required before the user can access the service." *Id.* at 1230.

The parties do not claim that the Agreement falls under these web-based contracts, and we agree. Indeed, Eglin argues that the trial

4

so-called browsewrap agreements, for example, courts have asked whether the notice is "conspicuous enough to put a reasonably prudent person on inquiry notice." *Massage Envy Franchising, LLC v. Doe*, 339 So. 3d 481, 484 (Fla. 5th DCA 2022) (quoting *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 762 (Fla. 4th DCA 2017)); *see also MetroPCS*, 273 So. 3d at 1028. This is because "[w]hile new commerce on the Internet has exposed courts to many new situations it has not fundamentally changed the principles of contract." *LoanFlight Lending, LLC v. Bankrate, LLC*, 378 So. 3d 1280, 1286 (Fla. 2d DCA 2024) (quoting *Vitacost.com, Inc.*, 210 So. 3d at 762). Mutual assent remains the touchstone of contract formation. *Id.* And mutual assent cannot exist where a party does not have reasonable notice that an offer is at hand. In other words, reasonable notice of an offer is a necessary precondition to mutual assent. And requiring mutual assent ensures consumers know they are entering into an agreement. *See Glosser v. Vasquez*, 898 So. 2d 1179, 1181 (Fla. 3d DCA 2005) ("Thus, to create a contract and trigger contractual obligations, the parties must have a definite and distinct understanding, without which there is no assent and no contract.").

Notice can come in many forms. *See Hallman v. Carnival Cruise Lines, Inc.*, 459 So. 2d 378, 380–81 (Fla. 3d DCA 1984) (holding a passenger ticket warning passenger of the conditions of the contract was reasonable because of "the conspicuousness and clarity of notice on the face of the ticket"); *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34 (7th Cir. 2016) (explaining that a clickwrap agreement can signify acceptance of contract if "the layout and language of the site gives the user reasonable notice that a click will manifest assent to an agreement"). Whether a party received reasonable notice is a fact-intensive inquiry, and for internet transactions "the design and content of the relevant interface" are especially relevant. *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017).

With these principles in hand, we turn to Eglin's notice to Baird. It was a hyperlink buried in a routine monthly account

court erroneously relied on a case interpreting a "clickwrap" agreement. We merely point to these web-based variations and classifications as the backdrop of our decision today.

statement email. The hyperlink indicated only that it would link to Eglin's quarterly newsletter. The email said nothing about Eglin changing the terms of the agreement or that Baird should follow the hyperlink for important updates. The email made no mention of the Provision and Waiver. And even if Baird had followed the link, the newsletter did not provide the new terms either. These facts fail to show that Baird received reasonable notice of Eglin's offer. And without reasonable notice of the offer, mutual assent is impossible.

We, therefore, affirm the trial court's order concluding that Eglin and Baird did not enter into an enforceable arbitration agreement. We turn now to the trial court's order as to Stokes.

III.

A.

To begin, we find that Stokes received notice of Eglin's offer to arbitrate. The record reflects that Eglin mailed Stokes a cover letter, the Provision and Waiver, and clear instructions on how to reject arbitration through the opt-out form, notifying her that continued use of the account would constitute assent to arbitration. Evidence of mail properly addressed, stamped, and mailed creates a rebuttable presumption of receipt. *See Brown v. Giffen Indus., Inc.*, 281 So. 2d 897, 900 (Fla. 1973). Stokes does not dispute that she received the mailing. Rather, she claims the mailing is not sufficient notice because it lacks clarity and conspicuousness. We disagree.

The mailed notice was four pages long and consisted of a cover letter as the first page, the Provision and Waiver on the second and third pages, and the opt-out form on the last page. The first page stated that Eglin was offering an amendment to the Agreement and advised the reader to look over the terms on the very next page. This constitutes reasonable notice. Unlike the email to Baird, the mailed notice to Stokes was sufficient to ensure the consumer knew she was entering into an agreement to arbitrate.

Stokes was informed that continued use of the account after the effective date of the Agreement would constitute assent. And

6

after receiving reasonable notice, Stokes failed to opt out of the Agreement and continued to use Eglin's services. As noted above, assent can be demonstrated by acts or conduct, including continued use. *See MetroPCS*, 273 So. 3d at 1028 n.1 (explaining that "continued use of the company's services constituted assent to the terms and conditions and he must arbitrate"); *see also Krutchik v. Chase Bank USA, N.A.*, 531 F. Supp. 2d 1359, 1364–65 (S.D. Fla. 2008) (holding that plaintiff accepted the agreement to arbitrate where plaintiff did not overcome the presumption that the mailed agreement was received, failed to follow the procedure for rejecting the new terms, and continued to use services).

Stokes had reasonable notice of the Provision and Waiver. She could have opted out of the Provision, and she could have taken her business elsewhere if she did not assent to the Waiver. She was informed that continued use constituted assent. Under these circumstances, there was a valid offer and acceptance, and thus the parties formed an agreement. The trial court, therefore, erred in concluding that Eglin and Stokes did not enter into an enforceable agreement to arbitrate.

B.

We turn now to the application of the Provision and Waiver to the present claims. The trial court correctly concluded that the terms of the Provision and Waiver did not apply retroactively to Stokes' claim. Our decision in *All South Subcontractors, Inc. v. Amerigas Propane, Inc.*, 206 So. 3d 77 (Fla. 1st DCA 2016), is instructive. In *All South*, the defendants moved to compel arbitration based on the most recent version of the defendants' terms and conditions, which included an arbitration provision. *Id.* at 80. The plaintiffs argued that, rather than the newly amended language, the operative agreement was an older agreement from 2010. *Id.* They argued that the recently added provision did not "retroactively bind [the plaintiff] to an arbitration clause that [it] had not known existed" when the claims accrued. *Id.*

We held that the plaintiffs could not be compelled to arbitrate their claims because the language of the new arbitration agreement was not retroactive. *Id.* at 82. And the prior contract did not require arbitration. *Id.* ("There was no assent to arbitrate

disputes arising from the 2010 [contract] due to the lack of any arbitration language connected to that [contract].”). We adopt our reasoning in *All South* and apply it here. We will only apply an arbitration provision to previously accrued claims when the language of the agreement clearly demonstrates an intent for retroactive application. All Floridians have a substantive constitutional right to access the courts. *See* Art. I, § 21, Fla. Const. Arbitration agreements act as waivers of this right. *See Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 642 (Fla. 1999); *see also Infinity Design Builders, Inc. v. Hutchinson*, 964 So. 2d 752, 755 (Fla. 5th DCA 2007) (“In deciding whether arbitration is required, therefore, one must necessarily begin by asking whether the parties contractually agreed to arbitrate. If they did not, then unless there is a waiver of the right, Article I, section 21 requires submission of the legal disputes to the courts.”). It follows that the language of such an agreement must clearly state that it is to apply to previously accrued claims. The Provision here provides that it applies to claims:

> [A]rising in law, equity, or otherwise, and regardless of the type of relief sought involving your deposit account relationships, loans (including credit card accounts, but not loans secured by a dwelling), or any other product or service you obtain from us, the validity, enforceability, and scope of this Arbitration Provision and any related account/loan documents, and any relationship that results from any of the foregoing.

This language does not unequivocally state that it applies retroactively. Thus, it does not govern Stokes’ claim, which arose before the Provision became effective. We employ the same analysis as to the Waiver. Although we agree with Eglin that Stokes accepted the terms of the Waiver, it does not apply to her claim because the provision does not cover previously accrued claims.[2]

---

[2] This alternative ground also requires that we affirm as to Baird, even if, assuming arguendo, there had been sufficient offer and acceptance by way of the email and associated hyperlink.

AFFIRMED.

OSTERHAUS, C.J., and ROWE, J., concur.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————

Geralyn M. Passaro of Litchfiled Cavo LLP, Fort Lauderdale, and James R. Branit and Jason E. Hunter of Litchfield Cavo LLP, Chicago, Illinois, for Appellant.

Stephen H. Echsner of Aylstock, Witkin, Kreis & Overholtz, Pensacola, and Mark H. Troutman and Shawn K. Judge of Gibbs Law Group LLP, Columbus, Ohio, and Sophia G. Gold of KalielGold PLLC, Washington, D.C., for Appellee Kelsey M. Baird.

Robert E. Price of Ketterer Browne & Associates, Pensacola, for Appellee Paula Stokes-Wilkinson.